Our next case for argument this morning is Gaston v. Ghosh Good morning, Your Honor. Peter Kolodarchy for the Plaintiff. Counsel, please wait until you're called. Sorry? Mr. Kolodarchy. Thank you, Your Honor. Peter Kolodarchy for the Plaintiff. Initially, I'd like to advise, Your Honors, if you don't know, that the issues in this case are set for argument in another case on April 15th, a twin case, Wilson v. Wexford, 1824-19. Same issues as to Iskander and Monell. I understand, of course, that this Court cannot overturn Iskander sitting as 3. It would require an en banc proceeding. So I would ask whatever consideration you have. No, that's not correct. One panel can overrule another. It would help to know the circuit's rules. Have you read Rule 40E? I believe so. My reading on that was that if you were going to overrule an existing precedent, you had to have an en banc hearing. No, we don't. Just read the rule. I thought I did. The issue here, then, is whether the cumulative substandard conduct of Wexford's employee might, in a jury's estimation, amount to corporate deliberate indifference. It's worth stressing at the outset that this would be an entirely different case if it had proceeded on a respondeat theory below. For example, once the statute of limitations expires, it's not exactly in the plaintiff's interest to identify anyone else who might be the cause of the delay in this case. It actually works the other way. It's effectively setting the table for an empty chair defense. I don't mean to regurgitate or to go over in great detail the arguments that I made in the briefs, but something has occurred to me since that I think needs to be addressed, and that's the relationship of the motions for summary judgments and the motion to dismiss. I think it's fair to wonder whether the summary judgments on the individual defendants might effectively moot the issues on the motion to dismiss. That is, what difference is it in the result if the motions for summary judgment are upheld? That raises essentially a question of res judicata or estoppel by judgment, in which there are three elements involved. I'm totally lost. There's only one case here. Res judicata has nothing to do with it. Well, the question was raised, or has been raised, what effect the motions for summary judgment have on the motion to dismiss. Let me come at that from a different angle, Mr. Kolodarchy. In your view, if we were to agree to limit whether an employee of Wexford had acted with deliberate indifference toward their client? No. I don't believe so. It's a question of corporate deliberate indifference, institutional indifference. But without a policy of deliberate indifference, right? Correct. That, I think, is the essence of the respondeat theory. Forget about Iskander for a moment. Assume that this is a suit against Exxon, because one of its truck drivers ran over somebody on the street, and there's a tort suit against Exxon. Is it possible to prove that Exxon is liable without proving that the truck driver is liable? No. But he's an agent and asking... And the question then is, doesn't that apply to cases under 1983 as well? That before you can have derivative liability, you have to have somebody who's liable. Yes. But you may not know who that is, and it may in fact be an unknown. The example that I use is in a manufacturing defect case against Ford. Do you have to name and identify the out-of-control and injure you or kill you? No. You know that there is an individual on the line who made a mistake in the manufacturing process. By analogy, you can talk about design defects. I don't see how that's going to get you anywhere. The direct liability depends on someone's intent. If you can prove, say, the intent of The whole point of this debate about the extent to which Monell applies to private corporations is what happens when you cannot prove direct corporate liability. Then, under the Eighth Amendment, you have to show some individual liability. You know, we've got quite a few cases that say we don't have to consider whether Monell permits liability of the city because unless one particular city employee is liable, there is no possibility of city liability. We've said that over and over. Why wouldn't that be equally true of a corporation? Let me see if I can help. I think the Supreme Court's on voting and religious practice have suggested that private corporations now are vested with all elements of personality for legal purposes. Burrell and the abortion case talk about corporations as effectively natural persons and that therefore have intent or state of mind. I would suggest that Mr. Gaston, having come for care for his knee in May of 2009 and not having received the surgery he needed then for two and a half years, is a victim of deliberate indifference of the institution and its failure to provide Then there's no vicarious liability. When that's true, there's direct liability. They had a policy to deny Mr. Gaston his care. You can't prove that there's direct liability and you have to fall back on vicarious. That depends on being able to show that somebody was primarily liable. I don't draw the distinction between an employee acting in the course of their employment as a person, who it was. In this case, I can tell you who it was. It was a woman in Pittsburgh who was responsible for scheduling. I found that out in another case. I cited it in the briefs. She's in Pittsburgh and is deceased. To identify her as a party... How can we tell in the record of this case that that person meets the standards of deliberate indifference rather than negligence? I didn't depose her because I found out she was dead. The record is what it is. Do I understand your answer to be we can't? I cannot define her intent. That's correct. I can tell you that Mr. Gaston didn't get the medical care that he needed and this corporation undertook to provide him care. I thought your theory in essence was rather than identifying an individual, that the corporation diffused responsibility to such an extent that you can't prove that only one doctor, for example, acted with deliberate indifference, but the cumulative effect of delays and delays and delays amounted to deliberate indifference to Mr. Gaston's serious medical condition. That is exactly my theory. Your attack on what we're loosely calling the rule of Iskander, but obviously has been widely adopted in the federal courts, depends an awful lot on financial incentives. Wexford's brief tells us that they do not pay for care at outside hospitals and doctors, which would seem to undermine the financial incentive theory. Dr. Chmiel's deposition said the taxpayers of Illinois are going to pay for the care that I provide. Do you have a response to that? First of all, I think that the amicus brief sets it out in more detail than I did. I think the court in Shields set it out in more detail than I did in my briefs. Wexford is making the argument that there is a wrong factual assumption, at least for this case, in that argument. What does the record show here about financial incentives for Wexford? Well, that they hire substandard medical providers because they can afford to. In the first instance, I think that's fairly clear. And in the market, they don't hire and then they don't supervise them because that takes more money. And then when people have complications, you recall that Mr. Gaston's right knee went out and he stood in the doorway and Dr. Carter said, well, we have to wait for you to do that. Financial incentives are to limit the amount of medical care that they send offshore. You're not catching my question though. Dr. Chmiel, I don't know what the record says beyond what Dr. Chmiel said. And I'll have the same question for Wexford's lawyer about what the record shows here. But the theory behind the attack on extending Monell to private corporations is that you've got financial incentives for those private corporations that you don't have with municipal governments. Correct. So what does the record show here about those financial incentives as applied to Mr. Gaston? A judgment against them and exposure to a verdict based on respondeat superior increases the incentive to provide due care. And the whys and wherefores of the contract remain somewhat opaque to me after all these years of understanding where the money goes and what have you. I do know that they do not refer people out on a regular basis because there is a general limit on the number of people they can refer out. Is that in the contract? Yes. Do we have the contract in the record here? I don't believe so. But I can't recall if it's in this one or if it's in Wilson. Well, that kind of restriction is in the contract is somewhat important. I agree. I view the incentives as more a question of a judgment and exposure to There's a big focus here on the 15 month delay for knee surgery. Dr. Chamel testified in his deposition that that's not an unusual delay before surgery for normal civilian patients. I didn't see it. And that the care that the plaintiff received during those 15 months was, quote, probably within the standard of care. Your response? Well, he tore his meniscus in January of 2009. That doesn't heal itself. It requires surgery and debridement to be fixed. Dr. Chamel's comment was in the abstract that people with knee pain may wait 15 months for resolution. Is that context clear from his deposition? I don't think so, but that's my understanding of what happened to Gaston. He twisted his knee in May of 2009 and tore his cartilage at that point. There's nothing but surgery from that day forward to fix it. So it was a two and a half year delay to August of 2011? It was the fall of 2011 that he had surgery that was indicated two and a half years earlier. In the meantime, of course, his right leg does. He's had two surgeries on that and one on the left. I think at some point it's important to look back at what the intent of Congress was when they passed 1983 in the mid-19th century. That was obviously to provide a remedy for people whose constitutional rights were violated in federal court. The argument that I have made, and I think it's backed up by the academic consensus, is that the present interpretation of Monell on Respondeat Superior is wrong. The fact is that the law at the time that this statute was passed by Congress, Respondeat Superior was the law of the land. As for municipal corporations and private corporations, I think we've come to the realization... I don't think we can decide this case on the presumption that Monell was wrongly decided. We have to assume it's right. We are, in the Constitution's words, an inferior court. I think if you recognize though that it is infirm, less weight ought to be given because at some point... No, we follow it until the Supreme Court overrules it. I understand, but the point that I would make is that if indeed Congress's intent was to incorporate Respondeat Superior and the public policy impact of the results that are given, and you can look at the parade of horribles in the amicus brief, I think at some point that that does come to be a consideration that the court ought to make. I acknowledge the court cannot reverse Monell, but the Supreme Court has never considered whether private corporations are... I thought it decided in Atticus that a corporation could be held liable for the constitutional torts of its employee. Yes. I think that it was not clear that that was a decision, but the case was remanded against Kress for trial based on the conduct of the employee who was not a named defendant. I agree. It's not an explicit holding, but I believe that that's what that holding was. I'm out of time. Thank you, Counselor. Ms. Torchardt. Thank you. First, I want to clear up some of the fact that he had a torn cartilage, torn meniscus from 2009 until surgery was performed in 2011. That's not accurate. In May of 2009, when he first came in complaining of knee complaints, an X-ray was performed that showed arthritis. That was the working diagnosis for the physicians at Stateville until Dr. Schimel actually performed the surgery in August of 2011. In fact, in February of 2011, when an MRI was performed at UIC, the diagnosis by the radiologist was not a meniscal tear, was not a cartilaginous tear. It was that he had arthritis. So there was no diagnosis of a meniscal tear until Dr. Schimel's surgery in August of 2011, where he found a small degenerative tear in the knee. The doctors prospectively believed it could. There was evidence of gunshot pellets remaining in the knee after an earlier gunshot wound. That, along with he had degenerative arthritis in both of his knees, diagnosed by X-ray, by MRI, confirmed by the treating orthopedic surgeon at UIC. So to cast this as the inability to repair a known meniscal tear in May of 2009 is simply inaccurate. These doctors were working with a diagnosis of arthritic needs. Dr. Schimel's testimony here is very important. He's the expert who has testified in this case that patients with these types of needs, with chronic arthritic conditions, can be managed non-operatively over a number of months with medication, ice, knee braces, bunk permits, because they know that surgery in these instances isn't always successful. So non-operative management, according to Dr. Schimel, the independent treating orthopedic surgeon, can be reasonable. When he was asked, well, do you think any, quote, delay in his surgery until August of 2011 made a difference, he said, I can't say that it caused an aggravation in his pain. Meanwhile, we know throughout that entire period of time that his pain was being addressed. When he would come into the sick hall, specifically with complaints regarding the left knee, he was given pain medication. Initially it was Motrin. It was later changed to Ultram, so they went from a non-steroidal anti-inflammatory medicine to an opioid to address his chronic knee pain. Dr. Schimel told Mr. Gaston, when he came in and in June of 2011 before his surgery, Mr. Gaston was told, we can perform surgery on this left knee, but there's no guarantee that that's going to eliminate the pain that you have from your arthritis. That's in the preoperative note dated June 6, 2011. They're telling him at that time, we can do this surgery, but there's no guarantee that's going to address your arthritic pain. And in fact, after the August surgery on the left knee, Mr. Gaston continued to have pain in that left knee for quite some time. So were these physicians deliberately indifferent to an excessive risk of injury to Mr. Gaston's knees? And the answer to that is no. Was this cruel and unusual punishment as called for under the Eighth Amendment? And the answer to that is no. These were medical judgments exercised by his physicians. When he would come in with specific complaints, they were addressed. Mr. Gaston wanted quicker surgery, but Mr. Gaston is not a physician. Counsel, could I ask you to address the evidence that seems to suggest that when the MRI on his right knee was delayed for six months until his left knee healed? Yes. Given the nature of an MRI, I don't quite understand that approach. I think the medical judgment there was, we're not going to be able to do anything with regard to the right knee until this left knee is healed. In other words, we're not going to perform surgery on that right knee if you're still having trouble with the left knee, because then we've got two compromised knees. Would you agree that an MRI was indicated at that point? I think it might have been indicated, but what Dr. Carter's judgment at that point was, we need an MRI close in time to we can't do surgery until this left knee is healed. That was his medical judgment in August. Even though you've been telling us that apparently everybody was operating on an incorrect diagnosis with respect to the left knee for many months. It wasn't an incorrect diagnosis, Your Honor. It was a correct diagnosis. Incomplete. I'm not even sure it was incomplete. We're here on summary judgment. Even at the time of surgery, Dr. Chamel described it as a small degenerative tear in the meniscus that was simply shaved away. The rest of that meniscus remained intact. I don't believe the doctors were ever working under an improper diagnosis. He had known arthritis. He had chronic degenerative arthritis. In fact, the MRI showed that he had arthritis throughout all three compartments of his left knee. Counsel, you, in dealing with the larger legal issue that may or may not need to be decided in this case, you rely heavily on the claim that you do not, that Wexford does not pay for outside care. What does the record tell us about that? What we know from Dr. Chamel's testimony is that Wexford does not pay for outside medical care at UIC. His testimony was simply that the taxpayers of Illinois pay for his care, right? Yes. We don't have any details about the contract? No, not in this record. You didn't submit any? No. So, frankly, that seems pretty speculative from both sides. We have the treating physician to whom he was referred saying that UIC is paid by the taxpayer. If this is your theory, if your theory is that those of us who have expressed skepticism about extending when elder private corporations are operating from the wrong factual foundation, you've got control of those facts, and they're not in this record, right? Outside of Dr. Chamel's testimony, that's correct. Are they in the Wilson record? Good to get back to the question about the contract. I don't know. How many contracts are there for these physicians with regard to their services? The physicians themselves don't have a contract with the state. Wexford has a contract with the state to provide medical care at these institutions. There's no agreement, contractual agreement, between the physicians and Wexford? Between the physicians and Wexford, they're employees of Wexford. There's what? They are employees of Wexford, the physicians are. And there's no employment agreement? Not that I'm aware of and not in this record. Well, not that you're aware of and not in this lawsuit in any event. Right. So, the vicarious liability issue is moot in this case because plaintiff has failed to prove that these three physicians were deliberately indifferent to the condition of his left knee. The medical records from Stateville show that each time he came in complaining of knee pain, it was addressed. They treated him for his chronic arthritic condition with medicine, knee braces, ice. They increased the level of his medication when his complaints increased and they did refer him to an orthopedic specialist when his symptoms worsened. So, vicarious liability becomes a moot point. Let me get back to this business about being employees and no known written agreement. Is that typical with, say for example, hospitals and physicians who have staffed the hospitals? In the hospital setting, I believe there is often a contractual agreement between the physician and the hospital. But I think that varies from hospital to hospital. Some are employees, some are independent physicians with privileges, so I think that varies. But as far as you know, there is no agreement between Wexler and any of their employees. I don't know. Would that make a difference in this case? As to whether there was a contract between the physicians and Wexford? Yeah. No, I don't believe so. No, I don't believe so. Make any difference how many times they can refer to outside specialists, for example? If a contract limited them in some manner, then we would have a policy and practice claim against Wexford. On the issue of vicarious liability, the court has addressed this a number of times. In the 1983 setting, in Iskander, in Shields, and in Hahn. In Monell, the Supreme Court relied on the language of Section 1983 to determine that vicarious liability was not appropriate. For municipalities? For municipalities. So why should the courts depart from the general rule of responding on superior liability in this context? Because of the language in Section 1983 and the Supreme Court's interpretation of it. The Supreme Court said that Congress elected that specific language in a manner so that the individual or the corporation either had to subject the individual to a deprivation of rights or cause another to deprive an individual of its rights. And the Supreme Court said in Monell, that language tells us that Congress did not intend for Section 1983 to provide for vicarious liability. The U.S. Supreme Court has said nothing differently since. There's been no intervening Supreme Court authority. What do you make of Atticus? I don't think that Atticus raised that issue. Vicarious liability wasn't even raised in Atticus. In addition to that... The other argument is that it was just simply taken for granted. In addition to that, there's language about custom and practice in Atticus. And I don't know whether the plaintiff, in his complaint, raised the issue of a custom and practice on behalf of the corporate defendant. If that's the case, then that would fall within the language of 1983. I don't think Atticus is helpful on this point, and I don't think it's enough to suggest that the Supreme Court has changed its mind since Monell. The Supreme Court was very specific in Monell about how it interpreted the language of 1983. And that language is the same, whether the defendant's a municipality or a private corporation. So I don't believe there's any basis to disturb the law in this circuit, or, as this Court stated, there is a unified phalanx of case law across the United States on this point. 1983 does not permit vicarious liability. With regard to the costs, we'll stand in our briefs. But we're asking this Court to affirm the District Court's order in favor of the defendants on the deliberate indifference count, affirm the order dismissing the vicarious liability count, the District Court properly followed the precedent of this Court when it dismissed the vicarious liability count, and affirming costs in favor of the defendant. Thank you. Thank you very much, Counsel. The case is taken under advisement. Our next case for argument is La Riviere.